TRUSTEES OF THE BOSTON AND MAINE
CORPORATION, debtor *vs.* MASSACHUSETTS
BAY TRANSPORTATION AUTHORITY.

Suffolk.   January 4, 1973. — March 29, 1973.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & WILKINS, JJ.

*Arbitration.   Value.*

An arbitrator, who determined the value of a railroad line to be sold
by combining the values of its land and its physical property, did
not, in violation of G. L. c. 251, § 12 or § 13 (a), exceed the author-
ity conferred upon him by a contract between the buyer and the
seller, which authorized him to determine the value of the property
"as a unit limited to its use solely for transportation purposes."
[391–392]

In the absence of fraud, a court may not set aside an arbitrator's
award upon objections which appeared to be that he exceeded his
authority but which were in fact that he committed various
errors of law in valuing the property.   [390–392]

An arbitrator, who made a portion of his valuation of a railroad line
contingent upon the Interstate Commerce Commission's granting
the seller permission to abandon certain freight service, did not,
in violation of G. L. c. 251, § 12 or § 13 (a), exceed the authority
conferred upon him by a contract between the buyer and the seller
which stated that the sale price should compensate the seller for
losses due to reduced freight revenues and increased freight
costs caused by the sale.   [392–393]

An arbitrator's award may properly be made subject to such an
ascertainable future event as the Interstate Commerce Commis-
sion's permission to one party to abandon certain freight service.
[393]

Neither an application under G. L. c. 251, § 9, to an arbitrator for
modification or correction of an award nor his modification or
correction will extend the period within which a party may file an
application to vacate or modify the original award under G. L.
c. 251, § 12 (b) or 13 (a).   [393–395]

PETITION filed in the Superior Court on September 22,
1971.

The case was heard by *Ponte, J.*

*Joseph H. Elcock, Jr.* (*Ronald G. Busconi* with him)
for Massachusetts Bay Transportation Authority.

*Edward I. Masterman* (*Andrew C. Culbert* with him)
for the Trustees of the Boston and Maine Corporation.

WILKINS, J.   In 1964 the Boston and Maine Corporation (B & M) and the Massachusetts Bay Transportation Authority (MBTA), established pursuant to G. L. c. 161A, entered into an agreement (Agreement) concerning the continuation of passenger service on and over B & M lines within the territory of the MBTA.   In that agreement the B & M granted an option to the MBTA, subject to certain conditions, to lease or purchase any right of way of the B & M within the Commonwealth which was to be used by the B & M for the provision of passenger service for the MBTA under the Agreement. Among those lines was the "Reading Branch Line" running almost seventeen miles from Boston to Wilmington Junction.   The Agreement provided that the notice of exercise of any option should "state the price which the . . . [MBTA] is willing to pay to . . . [B & M] for the . . . purchase of any said right-of-way." If the B & M objected to the price, it was required to "submit the issue of the price therefor, which shall be determined as the fair market value of the property as a unit limited to its use solely for transportation purposes, to arbitration in the manner hereinbelow provided."   Subsection C (1) of par. 11 of the Agreement provided that if the MBTA should exercise an option to purchase a right of way, "[a]dequate provision shall be made in the exercise of any said option to purchase for the permanent availability, by easement or otherwise, of any or all of said rights-of-way for the continued operation of the present and reasonably forseeable [*sic*] expanded freight service by . . . [B & M], jointly with the . . . [MBTA], but under the traffic control of the . . . [MBTA]."

In August, 1968, certain amendments, which are significant for the purposes of this proceeding, were made in the Agreement.   The provision quoted above concerning arbitration of the issue of the price of any right of way was modified insignificantly (e.g., by the deletion of a comma) and further language was adopted concerning arbitration.   That further language provided, among other things, that the arbitrator should conduct the arbi-

388                                   363 Mass. 386

Trustees of Boston & Maine Corp. *v.* Mass. Bay Transp. Authy.

tration in accordance with G. L. c. 251 and that his determination and award "shall be final and binding upon the parties and shall be a complete bar to any claims or demands in favor of either party against the other."

The August, 1968, amendment also provided that the language of subsec. C (1) of par. 11 of the Agreement, quoted in part above, "was intended to and does provide for payment to the . . . [B & M] for any damages resulting in economic losses suffered by the railroad in the form of reduced freight revenues and increased costs of operation of freight services resulting from the exercise of the option granted . . . to the . . . [MBTA]."

On August 21, 1969, the MBTA exercised its option to purchase the Reading line from the Cambridge Street bridge in Boston to Wilmington Junction. The MBTA offered to pay the sum of $4,000,000. In the letter exercising the option the MBTA stated that "it is . . . understood" that the amount offered "includes payment for any damages resulting from economic losses suffered by the railroad in the form of reduced freight revenues and increased cost of operation of freight services resulting from the exercise of the option granted in accordance with . . . [the language of the August, 1968, amendment quoted in the previous paragraph]."

Four days later the B & M invoked the arbitration provisions of the Agreement, as amended, stating that the matters in controversy were the price which the MBTA should pay and "adequate provision for the permanent availability, by easement or otherwise, of said Reading Line for the continued operation of the present and reasonably foreseeable expanded freight service by . . . [B & M]."[1]

The arbitrator was selected. Hearings commenced in March, 1970. After seventy-three hearing days, during

---

[1] Subsequent to the exercise of the option, proceedings in reorganization of the B & M were commenced in the United States District Court for the District of Massachusetts, and individuals were appointed trustees in reorganization of the property of the B & M. These individuals are the plaintiffs in the case now before this court. References herein to the B & M include those trustees where appropriate.

which twenty-six witnesses were heard, 104 exhibits were introduced and more than 4,300 pages of testimony were transcribed, final arguments were heard and briefs were submitted in June, 1971. On August 30, 1971, the arbitrator submitted his findings and award. He found that the "fair market value for the land and physical property" was $15,909,866. He further found that "the permanent economic damages to be suffered by the . . . [B & M] if the Interstate Commerce Commission permits the abandonment of freight service between . . . [a point in Medford and a point in Melrose] to be $2,147,000, which award is to be held in abeyance and made contingent upon the action of the Interstate Commerce Commission." The arbitrator found that if such freight service is not abandoned, the B & M should "repay to the . . . [MBTA] for the permanent easement, which must run in favor of the . . . [B & M], the sum of $278,230."

On September 16, 1971, the MBTA applied to the arbitrator for modification and correction of the award, stating among the grounds for the application that "[t]he award is not in conformity with the submission of the issue" and that "[t]here are evident miscalculations of figures and evident mistakes in the description of things and properties."

On September 22, 1971, the B & M petitioned in the Superior Court for confirmation of the arbitrator's award. On November 1, 1971, the arbitrator submitted a modification and correction of his original award, reducing the principal amount by approximately $18,000 to $15,891,896. On November 29, 1971, the B & M moved to amend its petition to confirm the arbitrator's award so as to include the arbitrator's modification and correction. On January 5, 1972, within ninety days of the submission of the arbitrator's modification and correction of his original award, but not within ninety days of the submission of that original award, the MBTA filed (in the pending proceeding to confirm the award as modified) an application to vacate or, in the alternative, to modify the arbitrator's award.

The judge allowed the petition of the B & M for confirmation of the award, as modified by the arbitrator, and denied the application of the MBTA to vacate or modify that award. The MBTA thereupon excepted to the actions of the judge and claimed an appeal from his order confirming the award. All questions sought to be raised are open on the exceptions; there is no need to consider the appeal. *G. L. Rugo & Sons, Inc.* v. *Lexington,* 338 Mass. 746, 748. *Fazio* v. *Employers' Liab. Assur. Corp. Ltd.* 347 Mass. 254, 258.

Of the grounds stated in G. L. c. 251, § 12, upon which a court may vacate an award, the MBTA relied on only one, namely, that the arbitrator exceeded his powers. In seeking, as a second alternative, a modification or correction of the award, the MBTA relied on the ground, stated in G. L. c. 251, § 13 (a), as appearing in St. 1960, c. 374, § 1, that the arbitrator "awarded upon a matter not submitted to . . . [him] and the award may be corrected without affecting the merits of the decision upon the issues submitted." In each instance the MBTA is contesting the action of the arbitrator on the ground that he acted in excess of the authority conferred on him, a question which is always open for judicial review. See *M. S. Kelliher Co.* v. *Wakefield,* 346 Mass. 645, 647.

Our decisions have plainly indicated, however, the narrow scope of judicial review available when a matter submitted to arbitration has been decided. If an arbitrator has committed an error of law or fact in arriving at his decision, a court will not upset the finding unless there is fraud involved. *Glenn Acres, Inc.* v. *Cliffwood Corp.* 353 Mass. 150, 155. Even a grossly erroneous decision is binding in the absence of fraud. See *McGovern* v. *Middlesex Mut. Ins. Co.* 359 Mass. 443, 445. There is no requirement in G. L. c. 251 (the Uniform Arbitration Act for Commercial Disputes) that the arbitrator give a statement of reasons for his decision, setting forth findings of fact and conclusions of law. *Fazio* v. *Employers' Liab. Assur. Corp. Ltd.* 347 Mass. 254, 258. Where the parties have "received what they agreed to

363 Mass. 386                                                         391

Trustees of Boston & Maine Corp. *v.* Mass. Bay Transp. Authy.

take, the honest judgment of the arbitrator as to a matter referred to him" (*Phaneuf* v. *Corey*, 190 Mass. 237, 247), the law is clear that the award is binding, and thus free from judicial interference, in the absence of fraud. *Carter, Moore & Co. Inc.* v. *Donahue*, 345 Mass. 672, 676. Cf. *Greene* v. *Mari & Sons Flooring Co. Inc.* 362 Mass. 560, 563.

We turn then to each objection of the MBTA to the arbitrator's action to determine whether it deals merely with an asserted error of law or fact (with which a court may not interfere in the absence of fraud), or whether it deals with action by the arbitrator which, because it is beyond the scope of the subject submitted to him for decision, may be the basis for action by a court to vacate or modify the award.

The arbitrator determined the value of the property "as a unit limited to its use solely for transportation purposes." The fact that he found a value for the land, which he combined with a value for the physical property, to arrive at the fair market value of $15,891,896 does not mean that he did not arrive at a value for the property as a unit. Indeed, the evidence presented by the MBTA followed the same practice. The arbitrator expressly stated that "[t]he issue to be determined by this arbitration is the fair market value of the property . . . including land, physical property, and economic damages as a unit limited to its use solely for transportation purposes." Although the MBTA disapproves of the manner in which the arbitrator valued the property according to the standard set forth in the amended Agreement, his "findings and award" show that all steps taken by him were intended by him to comply with that standard, recognizing the present necessity of use by the B & M of the line for freight.

It would add nothing to the law of the Commonwealth to analyze in detail each of the objections of the MBTA to the action of the arbitrator in arriving at the fair market value of $15,891,896. Although those objections are expressed in terms that the arbitrator exceeded the

scope of the matter referred to him for decision, they are in fact objections that the arbitrator committed a variety of errors of law in valuing the property according to the standard which he purported to follow. There is nothing to show that the arbitrator did other than what he was supposed to do. Consequently, based on the authorities cited above, a court may not vacate or modify that award, even if it were to agree that the arbitrator made an error of law or fact in considering the matter submitted to him for decision.

There remains for consideration the treatment by the arbitrator of the matter of permanent economic damages. The arbitrator concluded that there would be no economic damages sustained by the B & M until it was granted permission by the Interstate Commerce Commission to abandon freight service between a point in Medford and a point in Melrose.[2] He, therefore, made his award in this respect "contingent upon the action of the Interstate Commerce Commission with the understanding that this section of the award will not take effect until such a ruling has been made." His contingent award for permanent economic damages to be suffered by the B & M, if the Interstate Commerce Commission permits the freight service to be abandoned, was $2,147,000. He further concluded, in his award as modified, that if the freight service is not to be abandoned, the B & M should "repay" to the MBTA, for its permanent easement for freight purposes, the sum of $278,430.[3]

The MBTA objects to consideration of the matter of economic damages by the arbitrator, asserting that because the B & M would not suffer economic damages until freight service was abandoned and freight service could not be abandoned until the Interstate Commerce Commis-

---

[2] The reasons for this conclusion are not explained clearly in the arbitrator's findings and award.

[3] The MBTA does not specifically challenge that aspect of the award which requires the B & M, now subject to bankruptcy proceedings in the Federal Court, to repay the sum of $278,430 to the MBTA if at some unspecified time the Interstate Commerce Commission determines that freight service is not to be abandoned.

sion so ruled, the subject of economic damages was not properly before the arbitrator. We disagree.

The agreement provided in subsec. C (1) of par. 11 that "[a]dequate provision shall be made *in the exercise of any said option to purchase* for the permanent availability, by easement or otherwise, of any or all of said rights-of-way for the continued operation of . . . freight service" (emphasis supplied). The August, 1968, amendment provided that this language in subsec. C (1) of par. 11 was intended to "provide for payment to the . . . [B & M] for any damages resulting in economic losses suffered by the railroad in the form of reduced freight revenues and increased costs of operation of freight services *resulting from the exercise of the option* granted . . . to the . . . [MBTA]" (emphasis supplied). These provisions in the amended Agreement look to a determination of economic losses (and a determination of the value of the easement for freight service) because of the exercise of the option. Indeed, in its letter exercising the option the MBTA stated that its price included payment "for any damages resulting from economic losses suffered by the railroad." Surely the MBTA considered economic losses to be part of the price of $4,000,000 which it stated when it exercised the option. In these circumstances it is not surprising that the arbitrator concluded that the subject of economic losses was to be decided by him. The arbitrator was correct as matter of law in determining that the issue of economic damages was submitted to him for determination.

There was no error in determining that the award of economic damages was contingent on the occurrence of an ascertainable future event, a grant by the Interstate Commerce Commission to the B & M of authority to abandon certain freight service. An arbitrator's award may properly be made subject to such an ascertainable future event. See *Strong* v. *Strong*, 9 Cush. 560, 567.

Although we have acted on the merits of the exceptions of the MBTA to the denial of its application to vacate or modify the arbitrator's award, there is substantial doubt

that that application was filed in the Superior Court on time. An application to vacate an award must be filed within the time prescribed by G. L. c. 251, § 12 (b), and an application to modify or correct an award must be filed within the time prescribed by G. L. c. 251, § 13 (a). When the MBTA application was filed, the statutory time limit for filing each such application was "ninety days after delivery of a copy of the award to the applicant." [4] The MBTA filed its application in the Superior Court on January 5, 1972, within ninety days of the November 1, 1971, modification and correction of the original award, but not within ninety days of the delivery of the August 30, 1971, award. [5]

The MBTA contends that its application to vacate or modify the award was seasonably filed because it was filed within ninety days of the delivery of a copy of the modification of the award. Section 9 of G. L. c. 251 allows a party to apply to an arbitrator (1) for correction of an evident miscalculation of figures or an evident mistake in a description of a person, thing or property, (2) for modification or correction of some imperfection in a matter of form, or (3) for the purpose of clarifying the award. These limited functions of the arbitrator after delivery of a copy of his award do not suggest that the time for filing an application to vacate or modify the award may be extended. Sections 12 and 13 of G. L. c. 251 do not recognize the pendency of a request to the arbitrator to modify the award or an actual modification or correction of the award by the arbitrator as measuring points for determining whether an application to the court to vacate or modify an award has been seasonably filed. If it were necessary to a decision in this case, we

---

[4] By St. 1972, c. 200, these time periods are now thirty days after delivery of a copy of the award.

[5] The bill of exceptions does not clearly show when a copy of the award was delivered to the MBTA. In its reply brief, however, the MBTA concedes that the original arbitration award was rendered more than ninety days prior to the filing in the Superior Court of its application to vacate or modify that award. We take this to be a concession that a copy of the award was delivered to the MBTA more than ninety days prior to January 5, 1972.

would hold that neither an application to an arbitrator under G. L. c. 251, § 9, for modification or correction of his award nor a modification or correction of that award by the arbitrator extends the period within which a party may file an application to vacate or modify the original award.[6]  Such an interpretation of G. L. c. 251 is consistent with the purpose of attaining prompt and conclusive answers to issues submitted to arbitration.  See *Emporium Area Joint Sch. Authy.* v. *Anundson Constr. & Bldg. Supply Co.* 402 Pa. 81, 84–85.

> *Appeal dismissed.*
> *Exceptions overruled.*

---

[6] If, while an arbitrator is considering an application to him under G. L. c. 251, § 9, to change his award, an application to confirm the award is heard, the court itself may, of course, under G. L. c. 251, § 9, submit the question of modification, correction or clarification of the award to the arbitrator.